**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| **HAMILTON HALL SWART, III and**<br>**RICHARD EARL DASILVA** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **Civil Action No.  3:23cv753** |
| | : | |
| **JASON S. MIYARES AND HAROLD W.**<br>**CLARKE** | : | |
| | : | |
| **Defendants.** | : | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**STATEMENT OF FACTS**[1]

In 2020, the Virginia General Assembly passed a bill, HB5148[2], amending Code § 53.1-202.3, which expanded the statutory right of many prisoners, including plaintiffs, to enhanced good time credits.  The statute also excluded a large class of prisoners from receiving these enhanced credits. Code § 53.1-202.3(A)(specifically listing many offenses *not* entitled to enhanced credits).  Attempts to commit murder were not included among those offenses. *Id.*  The

---

[1] For purposes of a motion to dismiss, the court must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). A court then "draw[s] all reasonable inferences in favor of the plaintiff." *Nemet Chevrolet v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).

[2] Plaintiffs' Amended Complaint incorrectly cites the bill as HB rather than HR.

statute's effective date was July 1, 2022.[3]  At the time of the passage of the bill, both plaintiffs were serving time for attempted murder. Complaint ¶¶8,11.

In an opinion rendered in December 2021, then Attorney General Herring advised the Department of Corrections ("DOC") regarding various aspects of HB 5148, including his opinion, confirming the plain language of the statute, that those prisoners with *attempted* murder charges were not excluded from receiving the enhanced good time credits. https://www.oag.state. va.us/ files/Opinions/ 2021/ 21-068- Clarke -Issued.pdf.  A copy of that opinion is provided as Exhibit A.  Accordingly plaintiffs were notified by DOC that, pursuant to the new law, they would be released in or about July, 2022, the effective date for implementation of the act. Complaint ¶14.

In 2022, defendant Jason S. Miyares was elected attorney general. Complaint ¶15.  Mr. Miyares was a vehement opponent of expanded good time credits and voted against HB5148 when he was in the legislature. Complaint ¶16.  On April 13, 2022, he issued an advisory opinion asserting, *inter alia*, that, contrary to Attorney General Herring's opinion four months earlier, prisoners convicted of attempted murder were excluded by HB5148 from receiving enhanced good time credits. Defendants' Memorandum, Exhibit A (ECF #11-1).  Deciding to follow this latter advice, defendant Harold W. Clarke, then Director of the Department of Corrections (DOC), refused to release plaintiffs and others similarly situated. Complaint ¶18. Neither Defendant provided any opportunity for Plaintiffs to contest the withdrawal of their good time credits. Complaint ¶19.  Plaintiffs were finally released in July, 2023, about a year later than

---

[3]The delay was obviously necessary to give the Department of Corrections time to do all of the recalculations necessary and to provide time for affected prisoners to develop and submit release plans. It must also gather all of the staffing resources needed to perform those functions.

they should have been released had they received the enhanced good time credits provided by HB5148. Complaint ¶20.

A unanimous Supreme Court of Virginia, in the case of *Prease v. Clarke*, No. 220665 (Va. July 6, 2023), held that HB5148 did not exclude the offense of attempted murder from the enhanced good time credits and that "there is no basis in the governing statutes for denying Prease expanded good time credits on his attempted aggravated murder convictions."

The plaintiffs allege that defendants were aware that withdrawal of a vested release date causing further incarceration was a serious deprivation. Complaint ¶34.  In addition, it is alleged that defendants were personally aware of the impact on plaintiffs of their decision to refuse to give enhanced earned sentence credits to those eligible for those credits. Complaint ¶35.

## ARGUMENT

## INTRODUCTION[4]

Plaintiffs assert three constitutional claims regarding their incarceration after they should have been released pursuant to statute, namely the Eight Amendment and the Fourteenth Amendment, both procedural and substantive.

## I.   DEFENDANT MIYARES IS NOT ENTITLED TO ABSOLUTE IMMUNITY.

Defendant Miyares claims that in advising the Department of Corrections (DOC) not to release plaintiffs and others similarly situated he is entitled to "quasi-judicial" absolute immunity. Defendants Memorandum at 7.

"Quasi-judicial" absolute immunity has been held in this circuit as applying to those "performing judicial or prosecutorial functions." *Ostrzenski v. Seigel*, 177 F.3d 245, 249 (4th Cir.

---

[4]Since Plaintiffs' Amended Complaint is against both defendants in their individual capacity, Plaintiffs will not be responding to defendants' 11th Amendment immunity argument.

1999).  In *Ostrzenski*, the court, *inter alia*, held that members of a state medical disciplinary board were entitled to the immunity as "the boards perform essential judicial and prosecutorial functions." *Id.*  Quasi-judicial immunity has also been found to protect government advocates in the civil process on the same theory. *See Benavidez v. Howard*, 931 F.3d 1225, 1231 (10th Cir. 2019)("We subsequently recognized absolute immunity as extending to "government lawyers involved in civil proceedings."). However, "[a] government attorney's administrative duties and those investigatory functions that do not closely relate to an advocate's preparation for judicial proceedings are not entitled to absolute immunity. Rather, absolute immunity shields those acts undertaken by a government attorney in preparation for judicial proceedings and which occur in the course of his or her role as an advocate for the government.") *Id.*

The Supreme Court has noted that high level executives of the government are only entitled to qualified immunity. *Davis v. Scherer*, 468 U.S. 183, 196 (1984) ("higher level executives . . . enjoy only qualified immunity"). *See also Bruce v. Riddle*, 631 F.2d 272, 275, 279 (4ᵗʰ Cir. 1980)("emphasizing that officials in the judicial and legislative branches have personal absolute immunity while individuals acting as executives are entitled to only qualified immunity.").  Moreover, the Supreme Court has held that "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991). "The presumption is that qualified, rather than absolute, immunity is sufficient to protect government officials in the exercise of their duties. We have been 'quite sparing' in our recognition of absolute immunity, [citation omitted] and have refused to extend it any 'further than its justification would warrant.'" *Id.* at 487.  The Court's absolute immunity jurisprudence in each case was "predicated upon a considered inquiry

into the immunity historically accorded the relevant official at common law and the interests

behind it." *Imbler v. Pachtman*, 424 U.S. 409, 421 (1976).  The Court in *Imbler*, after examining

the common law and the interests behind it, concluded that prosecutors are absolutely immune

from a damage action while performing functions that "were intimately associated with the

judicial phase of the criminal process, and thus were functions to which the reasons for absolute

immunity apply with full force." *Id.* at 430.  Of significance here, however, the Court refused to

extend that immunity to the prosecutorial function of giving legal advice to the police because

the relevant factors (common law and the interests behind the common law) did not justify such

an extension of absolute immunity. *Burns, supra.*, 500 U.S. at  492-96.  *See also Blouin ex Rel.*

*Estate of Pouliot v. Spitzer*, 356 F.3d 348, 357-8 (2d Cir. 2004)(refusing to extend absolute

immunity where the state attorney general claimed its protection as "they were merely providing

advice to state officials").

Nonetheless and relying entirely on one Sixth Circuit decision, *Campbell v. Patterson*,

724 F.2d 41 (6th Cir. 1983), Defendant Miyares maintains that he is absolutely immune from

damages for any advice that he renders.  *Patterson* did hold the Michigan attorney general

absolutely immune from liability for an opinion he gave.[5]  However, the continuing validity of

*Patterson* is questionable as it was decided before the *Burns* decision denying absolute immunity

for legal advice given by a government attorney and no case has cited *Patterson* to grant

absolute immunity in those circumstances. Moreover, *Patterson* does not meet the test set by the

Supreme Court for determining whether absolute immunity applies, namely an identification of

---

[5]Unlike Virginia, in Michigan opinions of the attorney general are binding on the
requesting agency or official. *Patterson, supra*. at 43.

whether the immunity at issue was available at common law as well as the interests served by that immunity. *Paterson* only cited one authority, *Johnson v. Granholm*, 662 F.2d 449 (6th Cir. 1981), which involved members of Michigan Friends of Court, an entity intimately involved in the judicial process, far from the issue here. https://www.legislature.mi.gov/ Publications/ Friend_of_the_Court-WEB.pdf. *Patterson* simply failed to meet the requirements set by the Supreme Court for an extension of absolute immunity.

Also instructive is the Fourth Circuit's decision in *Campbell v. Florian*, 972 F.3d 385 (4th Cir. 2020), which analyzed the liability of a government attorney who, as here, wrote an advisory opinion that resulted in additional incarceration of the plaintiff beyond his legislatively mandated release date. There are three opinions in that case, the magistrate's, 6:16-cv-03265 (Oct. 1, 2018)(ECF#86)(finding, *inter alia*, that defendant government attorney was entitled to qualified, not absolute immunity), the district court's 6:16-cv-03265 (March 21, 2019)(ECF#97)(denying qualified immunity), and that of the Fourth Circuit (granting qualified immunity on the grounds that the plaintiff failed to prove that his deprivation was the result of deliberate indifference.). Not one even mentions no less applies absolute immunity. If defendants are right, three courts and five judges wasted considerable time determining under what circumstances such an attorney can be held liable.

In sum, defendant has failed to meet "his burden of showing that the relevant factors justify an extension of absolute immunity" to government attorneys who provide advice to agencies. *Burns, supra*. at 496.

II.     **PLAINTIFFS HAVE SET FORTH VALID CLAIMS THAT INCARCERATION BEYOND THEIR RELEASE DATE VIOLATES THEIR CONSTITUTIONAL RIGHTS.**

"[F]reedom from unlawful restraint is a right so core to our understanding of liberty that suffering even one day of unlawful detention is a harm recognized by the Constitution." *Hurd v. Fredenburgh*, 984 F.3d 1075, 1085 n.4 (2d Cir. 2021).  Incarceration without penological justification violates the Constitution. *King v. Rubenstein*, 825 F.3d 206, 219 (4th Cir. 2016)("Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'")(citing and quoting *Gregg v. Georgia* , 428 U.S. 153, 183, (1976)  *Cf. Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019)(analyzing penological justification for conditions of death row).

A.  Plaintiffs Have Made a Valid Claim for Relief Under the Eighth Amendment.

Numerous courts have held that incarceration after a mandatory release date violates the cruel and unusual proscription of the Eighth Amendment. *See e.g. Hurd v. Fredenburgh*, 984 F.3d 1075, 1085 (2d Cir. 2021)("unauthorized detention . . . past an inmate's mandatory release date qualifies as a harm of constitutional magnitude under the first prong of the Eighth Amendment analysis"); *Campbell v. Peters*, 256 F.3d 695, 700 (7th Cir. 2001) (Campbell argued that "if through deliberate indifference to the requirements of state law the correctional officials kept him imprisoned too long, his Eighth Amendment rights were violated. . . . In that sense, we believe that he has articulated a constitutional right); *Sample v. Diecks*, 885 F.2d 1099, 1108 (3d Cir. 1989)(("We think there can be no doubt that imprisonment beyond one's term constitutes punishment within the meaning of the eighth amendment."); *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985) (en banc) ("Detention beyond the termination of a sentence could

constitute cruel and unusual punishment if it is the result of "deliberate indifference" to the prisoner's liberty interest"); *Zigler v. Skiles*, No. 2:23-cv-00318 *7 (S.D.W.V. Aug. 29, 2023)("It is clear, then, that the alleged deprivation of Plaintiff's liberty interest is 'sufficiently serious' to support a claim under the Eight Amendment.").

The Fourth Circuit has held that incarceration beyond the termination of a prisoner's sentence may be an Eighth Amendment violation if defendants acted with deliberate indifference. *Golson v. Dep't of Corrections*, 914 F.2d 1491 (4th Cir. 1990)("To prevail under an eighth amendment theory, a plaintiff must demonstrate that defendants acted with deliberate indifference.")(citing *Sample, supra.* 885 F.2d at 1110 and *Haygood, supra.* 769 F.2d at 1355). Twenty years later, the court considered an Eighth Amendment claim against government attorneys whose opinion, as here, resulted in the failure of prison officials to apply work and good-conduct credits, thereby extending plaintiff's incarceration. *Florian*, *supra*. 972 F.3d at 393-95. The court, while declining to decide whether the Eight Amendment or the Fourteenth Amendment was the better vehicle for that claim, held that "[t]o qualify as a cruel and unusual punishment implicating the Eighth Amendment, Campbell's claimed deprivations must satisfy 'objective' and 'subjective' requirements." *Id*. at 393. The "objective test" is simply whether the claimed deprivation was "sufficiently serious." *Id.* The court assumed that detention past a prisoner's mandated release date was a sufficiently serious deprivation. *Id.* at 394.

The "subjective" test requires that the plaintiff show that the government official was deliberately indifferent to the plaintiff's plight by showing that the official "must have both 'subjectively recognized a risk of substantial harm' and 'subjectively recognized that his actions were inappropriate in light of that risk.'" *Id.* at 395. "The subjective component requires proof

of more than mere negligence but less than malice." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). Plaintiffs' Amended Complaint alleges that "[d]efendants were aware that withdrawal of a vested release date and that further incarceration without penological justification was a serious deprivation," and that "[d]efendants were also personally aware of the impact on inmates, such as plaintiffs, of their decision to refuse [to] give enhanced earned sentence credits to those eligible for those credits." Complaint ¶¶ 34, 35. Thus, Defendants are alleged to have "subjectively recognized a risk of substantial harm." Moreover, defendants must have known that Mr. Miyares' opinion was "inappropriate in light of that risk," as it rejected a plain reading of the statute and there was "no basis in the governing statutes for denying [a prisoner] expanded earned sentence credits on his attempted aggravated murder conviction." *Prease v. Clarke*, Record No. 220665, Slip Op. at 8. *See also* Opinion of former Attorney General Herring, *supra.* which Defendant Miyares was aware of but failed to address in his opinion four months later.[6]

The *Florian* court further held that even an official "who actually knows of a substantial risk . . . may be found free from liability if [h]e responded reasonably to the risk, even if the harm was not averted." *Florian, supra*. at 395 (quoting *Farmer v. Brennan*, 511 U.S. 825, 844 (1994). In *Florian*, the Court found that the defendant's opinion was reasonable, though wrong. The attorney in *Florian*, after careful study, had properly recognized that the act he was interpreting was inconsistent and that he "appropriately employed the normal tools of statutory construction to give his best interpretation of the new act." *Id.* at 396. In addition, one

---

[6]We are still at the pleading stage and the question is not whether plaintiffs have proved their case but rather whether plaintiffs have made plausible claims.

administrative court had upheld his interpretation. *Id*. at 396-97. Contrast *Florian* with the facts here. There was no inconsistency in HB5148, no court or other adjudicative body had ever sided with Mr. Miyares' interpretation and, most importantly, he failed to follow the "first rule of statutory interpretation," "reading the act itself." *Id*. at 395.[7] *See also Prease, supra*. at 7. ("The one canon of construction that precedes all others is that "[w]e presume that the legislature says what it means and means what it says."(citations omitted). The *Prease* court went on to identify the plain language of HB5148, concluding that there was "no basis in the governing statutes for denying . . . expanded earned sentence credits on his attempted aggravated murder convictions." *Id*. at 7-8.  The defendant failed to utilize the primary rule of statutory construction, the plain language of the statute refuted his interpretation and he was aware of the proper, plain language interpretation from Attorney General Herring's opinion.  In light of these facts, it is a reasonable inference that defendant Miyares was subjectively aware that his actions "were inappropriate in light of [the] risk" of "incarceration without penological justification."

The rationale for finding an Eight Amendment violation in this context is universal and long standing. The Eighth Amendment prohibits punishments which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain.'" *Gregg v. Georgia*, 428 U.S. 153, 183, (1976).  One class of "unnecessary and wanton" wrongs, and the one most relevant here, is those wrongs "totally without penological justification." *Id.*  Incarceration is a form of punishment and therefore if it is imposed "totally without penological justification" it may

---

[7]The *Florian* court also recalled Justice Frankfurter's three rules of statutory interpretation: "(1) [r]ead the statute; (2) read the statute; (3) read the statute!" *Florian, supra* at 395.

violate the Eighth Amendment.[8]  Finally, the Supreme Court has noted that "[w]here there is no legitimate penological purpose for a prison official's conduct, courts have 'presum[ed] malicious and sadistic intent.'" *Porter v. Clarke*, *supra*. 923 F.3d at 362.  "Put differently, if a prison official lacks a legitimate penological justification for subjecting an inmate to a condition of confinement that poses a substantial risk of serious harm—like prolonged solitary confinement, . . . the official is presumptively acting with deliberate indifference to that risk." *Id.*

Notwithstanding case law to the contrary, defendants urge the untenable position that even if the Eighth Amendment were applicable it would only apply to incarceration past the sentence imposed by the trial judge.  Defendants' Memorandum at 1, 21.  However, the case law demonstrates that extended incarceration in the face of statutory rights to credits mandated by the legislature are also implicated. *See e.g. Hurd v. Fredenburgh*, 984 F.3d 1075, 1088 (2d Cir. 2021)("Because New York's conditional release scheme is mandatory, there is no meaningful difference in Hurd's liberty interest in release from prison at the expiration of his maximum sentence and conditional release when he became entitled to an earlier release date."); *Dodds v. Richardson*, 614 F.3d 1185, 1192 (10th Cir. 2010)(a liberty claim may be for overdetention "longer than legally authorized, whether because the plaintiff's incarcerative sentence has expired *or otherwise*." (emphasis supplied).

Defendants describe plaintiffs' argument as alleging that Defendant Miyares "issued a faulty opinion, misinterpreting the intent of a legislative body of which he was a member." Defendants' Memorandum at 13.  However, since the statute was clear and unambiguous, their

---

[8]"May" in this context refers to the fact that the deprivation must be accompanied by a culpable state of mind.

was no basis to discern the intent of the legislature. Rather, an analysis of that opinion demonstrates that it was not just faulty or unreasonable, there was simply "no basis" in the governing statutes or the primary rule of statutory construction for his argument.

The plaintiffs have suffered a "sufficiently serious" deprivation and have plausibly alleged the "subjective" state of mind necessary to prove deliberate indifference. As such, they have stated a plausible claim of an Eighth Amendment violation.

B.   Plaintiffs Have Set Forth a Valid Claim of Substantive Due Process Protected By the Fourteenth Amendment.

"Substantive due process ensures the state will not deprive a party of property [or liberty] for an arbitrary reason regardless of the procedures used to reach that decision." *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000). *See also Cassady v. Tackett*, 938 F.2d 693, 697 n.5 (6th Cir. 1991)("Certainly the Supreme Court continues to recognize that the Due Process Clause has a 'substantive component' [citation omitted] and a due process violation may be found when a plaintiff has been deprived of a recognized property or liberty interest."). In Virginia, due to their mandatory nature, prisoners have a "liberty" interest in good time credits. *See* Point V. *infra*. As one district court has stated, "[t]he United States Court of Appeals for the Fourth Circuit has previously suggested that the Fourteenth Amendment's right to due process is the most appropriate constitutional lens through which to view the issue of overdetention. *West v. Prince George's Cnty.*, No. TDC-21-0863 *9 (D.Md. January 13, 2022) (citing *Florian*, 972 F.3d at 394).

The cases are legion holding that the Fourteenth Amendment protects prisoners from "overdetention." *See e.g. Hurd v. Fredenburgh*, 984 F.3d 1075, 1085 (2d Cir. 2021); *Kapordelis v. Myers*, 16 F.4th 1195, 1200 (5th Cir. 2021); *Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir.

12

2009)("[T]here is a substantive due process right 'to be free from continued detention after it was or should have been known that the detainee was entitled to release'"); *Wilson v. Johnson*, 535 F.3d 262, 263 (4th Cir. 2008)*("*Wilson claims that he is entitled to monetary damages for unconstitutional imprisonment because Virginia improperly extended the length of his prison sentence. . . . Assuming, as we must, that Wilson's well-pleaded allegations are true, we agree that his claim is viable); *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) ("We have recognized a protected liberty interest in being free from wrongful, prolonged incarceration."); *Hamilton v. O'Leary*, 976 F.2d 341, 344 (7th Cir. 1992)(Illinois state prisoners have a statutory right to receive good time credits . . .  and such a state-created entitlement to good time credits is a liberty interest protected by the Fourteenth Amendment. "). *See also Ziglar v. Skiles*, Civil Action 2:23-cv-00318, at *9 (S.D.W. Va. Aug. 29, 2023)("The Due Process Clause of the Fourteenth Amendment 'contains a substantive component that bars certain arbitrary, wrongful government actions "regardless of the fairness of the procedures used to implement them,"' and '[f]reedom from bodily restraint has always been at the core of the liberty protected' by it. *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)."  In *Foucha*, the Court emphasized that "[i]t is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." [citation omitted]. We have always been careful not to "minimize the importance and fundamental nature" of the individual's right to liberty." *Id*. *Cf. Baker v. McCollan*, 443 U.S. 137, 145 (1979)(noting that improper detention before trial "will after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due process of law.'").  "While some of these cases discuss procedural, rather than substantive, due process, they are relevant to the question of when liberty interests arise for incarcerated prisoners."

*Grinter v. Knight*, 532 F.3d 567, 573 n.3 (6th Cir. 2008).

Defendants, however, claim that prisoners have no constitutional rights if their incarceration does not exceed the limits imposed by the trial court. Defendants' Memorandum at 12 (regarding plaintiffs' Eighth Amendment claim) and 15-16 (regarding plaintiffs' substantive due process Fourteenth Amendment claim).  Thus, according to defendants, a prisoner who was arbitrarily and maliciously denied legislatively mandated work or good time credits has no constitutional claim. However, to paraphrase a recent Second Circuit case, because Virginia's "conditional release scheme is mandatory, there is no meaningful difference in [plaintiffs] release from prison at the expiration of [their] maximum sentence and conditional release when [they] became entitled to an earlier release date. Once [plaintiffs'] good time credit was approved, the expiration date of [their] maximum term of imprisonment and [their] "conditional release" date were one and the same for substantive due process purposes." *Hurd, supra*. 984 F.3d at 1088.[9]  *See also Campbell v. Peters*, 256 F.3d 695, 700 (7th Cir. 2001)(in the analogous Eighth Amendment context, Campbell argued that "if through deliberate indifference to the requirements of state law the correctional officials kept him imprisoned too long, his Eighth Amendment rights were violated even if the additional time was not very long. . . In that sense, we believe that he has articulated a constitutional right); *Cassady v. Tackett*, 938 F.2d 693, 697 n.5 (6th Cir. 1991)( "a due process violation may be found when a plaintiff has been deprived of a recognized property or liberty interest."). Defendants have cited no case to the contrary.

This is not simply a case of miscalculation of sentence reducing credit (Defendants'

---

[9]This should be obviously true as it is the legislature which sets (and can modify) both sentencing parameters as well as mandatory good time credits.

Memorandum at 16), but a claim that defendants' were "deliberately indifferent" and purposely and without justification refused to abide the legislatively mandated release date for numerous prisoners.

To prove a violation of substantive due process, a plaintiff must show that the offending official acted with deliberate indifference, which, in the context of overdetention requires a showing that "(1) the defendant had subjective knowledge of a risk of serious harm, consisting of continued detention when the plaintiff was entitled to be released; (2) he disregarded that risk; and (3) he did so by conduct that is more than mere negligence." *Alcocer v. Mills*, 906 F.3d 944, 953 (11th Cir. 2018). *See also Young v. City of Mount Ranier*, 238 F.3d 567, 576 (4th Cir. 2001) ("Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious [harm] to the detainee"); *White ex rel. White v. Chambliss*, 112 F.3d 731, 737 (4th Cir. 1997) ("A claim of deliberate indifference . . . implies at a minimum that defendants were plainly placed on notice of a danger and chose to ignore the danger notwithstanding the notice.").

Plaintiffs' Complaint satisfies this test.  Defendants had (1) "subjective knowledge of a risk of serious harm, consisting of continued detention when the plaintiff was entitled to be released"; (2) they disregarded that risk and (3) they "did so by conduct that is more than mere negligence."

The essential and fatal flaw of Defendant Miyares' position was his failure to adhere to the most fundamental rule of legislative interpretation, the plain language of the statute.  "The one canon of construction that precedes all others is that '[w]e presume that the legislature says

what it means and means what it says.'" (citation omitted) *Prease* at 7.[10]  The Court found that the attorney general's office ignored the plain language of the statute in its attempt to modify the law. "'We can only administer the law as it is written.' We may not extend the meaning of a statute 'simply because it may seem to us that a similar policy applies, or upon the speculation that if  the legislature had thought of it, very likely broader words would have been used.'" (citations omitted) *Prease* at 9.[11]  Having ignored the first, principal, and well established rule of statutory construction, the position of Defendant Miyares borders on the frivolous and demonstrates that it was inappropriate to the risk of harm it created, something he must have known from his legal training as well as the opinion of Attorney General Herring.  In fashioning his opinion, Mr. Miyares' followed his political beliefs rather than his legal training.  Thus, it constitutes an arbitrary and capricious response to the constitutionally based harm that would necessarily befall plaintiffs from his opinion.

    In *Florian*, the court found that the misinterpretation of a statute governing work and good time credit was "reasonable" and therefore defeated the plaintiff's Eighth Amendment

---

[10]This rule of legislative interpretation is long standing and universal. *See e.g. Bedroc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there' [citation omitted]. Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous."); *United States v. Fisher*, 2 Cranch 358, 399 (1805), ("Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction.").

[11]The Court also found that Defendant Miyares' argument that the statute's plain meaning was "irrational" (in his opinion) or "absurd" (before the Supreme Court) lacked any basis in law as the Court had "repeatedly explained that "[a]n absurd result describes an interpretation that results in the statute being internally inconsistent or otherwise incapable of operation." "Neither of those situations appear here." *Prease* at *9.

claim. The attorney in *Florian*, after careful study, had properly recognized that the act he was interpreting was inconsistent and he "appropriately employed the normal tools of statutory construction to give his best interpretation of the new act." *Id.* at 396.  In addition, one administrative court had upheld his interpretation. *Id.* at 396-97.  Contrast that with Defendant Miyares' opinion.  There is no inconsistency in the statute here, no court or other adjudicative body agreed with him and he failed to "appropriately employ[] the normal tools of statutory construction."  In fact, Defendant Miyares failed at the first step by not "reading the act itself." *Florian* at 395-96.

## IV.   DEFENDANT CLARKE ACTED WITH DELIBERATE INDIFFERENCE TO PLAINTIFF'S CONSTITUTIONAL RIGHTS.

Advisory opinions of the Virginia attorney general are only advisory, *see In Re: Dept. of Corrections*, 222 Va. 454, 463 (Va. 1981)("Opinions of the Attorney General are no more than guidelines for the benefit of public officials where our Court has made no definitive interpretation of the law."), and as with all clients, the decision whether or not to follow that advice rests squarely on the shoulders of the client.  Moreover, it is a fair inference that advice was not sought by Mr. Clarke, but rather initiated by Mr. Miyares.[12]  Defendant Clarke already had an opinion from Attorney General Herring to follow the plain language of the statute, that is not to exclude prisoners with *attempted* murder convictions from the enhanced good time credits mandated by the legislature. There is no apparent reason for seeking another opinion only four months later other than the partisan change in the attorney general's office. No other explanation has been provided by Mr. Clarke or the Department of Corrections.  Thus, without explanation,

---

[12]While defendants have supplied the advisory opinion of defendant Miyares, thy have not supplied or otherwise referenced a request from defendant Clarke.

Defendant Clarke chose to follow the advice of the new attorney general and reject that of the prior attorney general.  In doing so, he also ignored the plain meaning of the statute. Thus, he cannot hide behind the advice of counsel to exonerate himself from liability. His choice to ignore the advice given by the attorney general in December, 2021 and to follow the contrary advice four months later of a newly elected attorney general who opposed the legislation, with "no basis in the governing statutes," was arbitrary and rose to the level of "criminal recklessness."

## V.     PLAINTIFFS HAVE STATED A VALID CLAIM THAT THEIR RIGHT TO PROCEDURAL DUE PROCESS WAS VIOLATED WHEN NO OPPORTUNITY WAS PROVIDED TO CONTEST THE DECISION TO REVOKE THEIR GOOD TIME CREDITS.

It is beyond dispute that when a liberty interest in good time credits is at stake, procedural due process is required. *See e.g. Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (state created liberty interest in good conduct credits required a due process hearing); *Kapordelis v. Myers*, 16 F.4th 1195, 1200 (5th Cir. 2021) ("Because Kapordelis has a liberty interest in his accumulated good time credits, revocation of the credits must comply with minimal requirements of due process."); *Denny v. Schultz*, 708 F.3d 140, 143-44 (3d Cir. 2013) ("When such a statutorily created right [to good time] exists, "a prisoner has a constitutionally protected liberty interest in good time credit.");*Terry v. Jones*, 259 F. App'x 85, 86 (10th Cir. 2007) (Prisoners possess a liberty interest in their statutorily provided good time credits. [citations omitted] The government may not deprive a prisoner of those credits without due process.); *Gaston v. Coughlin*, 249 F.3d 156, 163 (2d Cir. 2001) ("A prisoner may not properly be deprived of a cognizable liberty interest without due process of law."); *Hamilton v. O'Leary*, 976 F.2d 341, 344 (7th Cir. 1992)("state-created entitlement to good time credits is a liberty interest protected by the Fourteenth Amendment."); *Masengale v. Streeval*, No. 7:19-cv-543, at *8

18

(W.D. Va. July 23, 2020)("it is well-established that inmates have a liberty interest in the forfeiture of vested good conduct time."*).*

Unable to dispute that "good conduct time can only be taken from a prisoner in a manner that comports with due process," defendants claim that the good time credits at issue had not vested before the effective date set by the legislature for implementation of the new regimen of good time credits and that Defendant Miyares effectively prevented that vesting by his opinion rejecting the good time credits mandated by the legislature for prisoners like plaintiffs. Defendants' Memorandum at 17.  However, as noted, plaintiffs had a liberty interest in the revised good time credits mandated by the legislature unless and until the legislature enacted new rules for such credit.  In essence, Defendant Miyares relies on his own wrongful conduct to deprive plaintiffs and others that which the legislature mandated.  However, "no man may take advantage of his own wrong." *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 232-33 (1959)(cited with approval in *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir. 1987). *See also Burlington Industries v. Milliken Co.*, 690 F.2d 380, 395 (4th Cir. 1982) (K.K. Hall, concurring in part and dissenting in part)("It is axiomatic that a party may not profit from its own wrongdoing."); *United States v. Hardy*, 299 F.2d 600, 609 (4th Cir. 1962)("It is well established that no man can take advantage of his own wrong.").  That is precisely what Defendant Miyares is attempting to do.

This Court "does not need to determine what exact process the [defendants] should have engaged in here because the record reflects that no process was provided at all." *West v. Prince George Cnty.*, Civil Action TDC-21-0863 *15 (D.Md. Jan. 13, 2022).

## VI.     NEITHER DEFENDANT IS ENTITLED TO QUALIFIED IMMUNITY BECAUSE THE RIGHT TO BE FREE FROM INCARCERATION WITHOUT PENOLOGICAL JUSTIFICATION WAS CLEARLY ESTABLISHED.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In the instant case, both the governing statute and case law made it abundantly clear that incarceration beyond the statutorily mandated release date violates the constitution if accompanied by deliberate indifference.

Defendants claim qualified immunity "because Plaintiffs did not have a clearly established constitutional right under the Eighth or Fourteenth Amendment to be released from custody on a conditional, good time release date - as opposed to at the expiration of their maximum allowable sentence." Defendants Memorandum at 21.[13]

In the Fourth Circuit, [i]n the absence of controlling authority that specifically and precisely adjudicates the right in question, a right may still be clearly established in one of three ways. First, "the decisional law may apply with obvious clarity to the specific conduct in question, even though `the very action in question has [not] previously been held unlawful,' *Owens ex Rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004) (stating that a right may be clearly established if it is "manifestly apparent from broader applications of the constitutional

---

[13]According to this theory, the Fourth Circuit in *Florian* could have avoided a lengthy analysis by simply reversing the holding of the district court that the defendants were not entitled to qualified immunity because the law in that case was clearly established. *See Campbell v. Florian*, Civil Action 6:16-3265 (D.S.C. Mar. 21, 2019). The Court of Appeals did grant qualified immunity, not on the grounds that the law was not clearly established, but because the plaintiff failed to make out a constitutional violation since the "lawyers were not deliberately indifferent to his plight." *Florian, supra*. 972 F.3d at 388.

premise in question").  Secondly, a right may be clearly established based on a  "'consensus of cases of persuasive authority' from other jurisdictions." *Owens, supra*., at 280. *See also Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017)("[D]espite the lack of directly on-point, binding authority, the right was clearly established based on general constitutional principles or a consensus of persuasive authority.").  Finally, the law is clearly established when public officials are on notice that their conduct violates established law even in novel factual circumstances,' so long as the law provided 'fair warning' "that their conduct was wrongful.") *Williamson v. Stirling*, 912 F.3d 154, 187 (4th Cir. 2018). *See also Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000)(law is clearly established if official "had to know he was violating the Constitution even without case law on point.").

Admittedly, there is no Fourth Circuit case differentiating, for Fourteenth or Eighth Amendment purposes, between the sentence imposed by the trial court and the mandatory maximum term set by state statute and that is not surprising since "there is no meaningful difference in [a prisoner's] liberty interest in release from prison at the expiration of his maximum sentence and conditional release when he became entitled to an earlier release date." *Hurd, supra*. 984 F.3d at 1088.  Moreover, it is widely recognized and established jurisprudence that incarceration "totally without penological justification." violates the constitution. In this case it is clear that there was no justification for continued incarceration once the legislatively imposed scheme of mandatary good time credits was applied.  Thus, the "general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question."  Moreover, there is a 'consensus of cases of persuasive authority' from other jurisdictions that have considered the precise issue. *See e.g. Hurd v. Fredenburgh*, 984 F.3d 1075

(2d Cir. 2021);  *Campbell v. Peters*, 256 F.3d 695, 700-01 (7th Cir. 2001).

Defendants rely on *Hurd, supra.* where the court held that it was not clearly established in the Second Circuit, in 2016 and 2017, when the events in the case took place, that the constitution prohibited detention beyond the sentence imposed by the trial court. Hurd, 984 F.3d at 1089-90.  However, unlike the broader Fourth Circuit rule discussed above, in the Second Circuit "[o]nly Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004).  Most importantly, the Second Circuit reached the merits in *Hurd* and found that both the Eighth and Fourteen Amendment are proper vehicles for bringing claims of deprivation of good time credits.  That is now the established law in the Second Circuit.

The language of the governing statute was clear, there is substantial authority for the proposition that incarceration beyond a one's sentence implicates either or both the Fourteenth and Eighth Amendments, there is substantial authority for the proposition that incarceration without penological justification violates the Constitution and there is persuasive authority that those amendments also protect the liberty interest at issue with regard to good time credits.

If there were any question in the Fourth Circuit about the rights involved and the process for determining them, *Florian* provided it.  "To qualify as a cruel and unusual punishment implicating the Eighth Amendment, Campbell's claimed deprivations must satisfy 'objective' and 'subjective' requirements." *Florian, supra.* at 393.  Thus, any reasonable official (and especially a reasonable lawyer) would know that a prisoner who could prove both requirements would have a cause of action under the Eighth Amendment.  The official would also know that to avoid liability s/he only need to prove that their conduct was "reasonable." *Id.* at 395.  At the

22

same time, the *Florian* court noted that "other circuits have recognized the due process right to be free from continued detention." *Florian* at 394.  Thus, the law provided 'fair warning' that their conduct was wrongful.

Thus, the rights at issue here were clearly established by the time that Defendant Miyares issued his opinion and therefore qualified immunity should be denied.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss should be denied.

Respectfully submitted,
Hamilton Hall Swart, III
Richard Earl DaSilva
By counsel

s/_____
Jeffrey E. Fogel
913 E. Jefferson Street
Charlottesville, VA 22902
(434) 984-0300
jeff.fogel@gmail.com

## CERTIFICATION OF SERVICE

I hereby certify that a true copy of Plaintiff's Brief in Oopposition to Defendants' Motion to Dismiss was served on defendants on December 27, 2023 by filing the same with the Court's ECF system, which will give notice to defendants.

s/_____
Jeffrey E. Fogel